# APPENDIX


(Excerpts from the Court of Criminal Appeals' Decision)

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 15, 2002 Session

**STATE OF TENNESSEE v. GDONGALAY P. BERRY**

**Direct Appeal from the Criminal Court for Davidson County
No. 96-B-866    J. Randall Wyatt, Jr., Judge**

─────────────

**No. M2001-02023-CCA-R3-DD - Filed April 10, 2003**

─────────────

**[Deleted: Introductory Paragraph]**

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed.**

DAVID G. HAYES, J., delivered the opinion of the court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

Thomas F. Bloom and James A. Simmons, Nashville, Tennessee, for the Appellant, Gdongalay P. Berry.

Paul g. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Dana M. Ausbrooks, Assistant Attorney General; Katrin Miller and David Hamm, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**[Deleted: Factual Background]**

**[Deleted: I.  Constitutionality of Death Penalty Procedures]**

**[Deleted: A.  Failure of Indictment to Allege Capital Offense]**

**[Deleted: B.  Guarantees of Confrontation and Cross-Examination]**

**[Deleted: II.  Speedy Trial]**

**III. Representation**

First, the Appellant argues that "[t]he trial judge erred in denying the Defendant's motion for dual representation, in improperly influencing him to forego hybrid representation, and in allowing him to represent himself at the suppression hearing without deciding the dual representation motion."

## A. Hybrid Representation

Both the United States and Tennessee Constitutions guarantee the right of an accused to self-representation or to representation by counsel. U.S. CONST. amend. VI; TENN. CONST. art. I, § 9; *Faretta v. California*, 422 U.S. 806, 807, 95 S. Ct. 2525, 2527 (1975); *State v. Northington*, 667 S.W.2d 57, 60 (Tenn. 1984). The right to self-representation and the right to counsel have been construed to be alternative ones; that is, one has a right either to be represented by counsel or to represent himself, to conduct his own defense. *State v. Small*, 988 S.W.2d 671, 673 (Tenn. 1999) (quoting *State v. Melson*, 638 S.W.2d 342, 359 (Tenn. 1982), *cert. denied*, 459 U.S. 1137, 103 S. Ct. 770 (1983)). "[W]aiver of one right constitutes a correlative assertion of the other. . . . [A] criminal defendant cannot logically waive or assert both rights. *State v. Burkhart*, 541 S.W.2d 365, 368 (Tenn. 1976) (quoting *United States v. Conder*, 423 F.2d 904, 908 (6th Cir. 1970)). Neither the United States Constitution nor the Tennessee Constitution grants the accused the right to "hybrid representation," *i.e.*, permitting both the defendant and counsel to participate in the defense. *Id*. at 371. It is entirely a matter of grace for a defendant to represent himself and have counsel, and such privilege should be granted by the trial court only in exceptional circumstances. *Melson*, 638 S.W.2d at 359. "Hybrid representation" should be permitted "sparingly and with caution and only after a judicial determination that the defendant (1) is not seeking to disrupt orderly trial procedure and (2) that the defendant has the intelligence, ability and general competence to participate in his own defense." *Burkhart*, 541 S.W.2d at 371. The length of a trial or the involvement of the death penalty does not *per se* constitute "exceptional circumstances." *Melson*, 683 S.W.2d at 359.

One of the most fundamental responsibilities of a trial court in a criminal case is to assure that a fair trial is conducted. *State v. Franklin*, 714 S.W.2d 252, 258 (Tenn. 1986) (citation omitted). Generally, the trial court, which has presided over the proceedings, is in the best position to make determinations regarding how to achieve this primary purpose, and absent some abuse of the trial court's discretion in marshalling the trial, an appellate court should not redetermine in retrospect and on a cold record how the case could have been better tried. *Id*. (citation omitted). The trial court, whose responsibility it is to ensure the orderly and fair progression of the proceedings, is in an excellent position to determine the legal assistance necessary to ensure a defendant's right to a fair trial. *Small,* 988 S.W.2d at 674. This determination will depend, in part, upon the nature and gravity of the charge, the factual and legal complexity of the proceedings, and the intelligence and legal acumen of the defendant. *Id*. (citing *People v. Gibson*, 556 N.E.2d 226, 233 (Ill. 1990)). The decision whether to permit "hybrid representation" rests entirely within the trial court's discretion and will not be overturned in the absence of a clear abuse of that discretion. *Id*.

In this case, the trial court denied the Appellant's request for "hybrid representation," finding that:

With regard to the first [*Burkhart*] prong, the Court concludes that the defendant is not seeking to disrupt the proceedings. Therefore, this prong weighs in the defendant's favor. The second [*Burkhart*] prong, however, weighs against the defendant's request. The defendant is capable of understanding the proceedings and consulting with his attorneys when necessary. By his own admission, however, he is unfamiliar with the Rules of Evidence, the Rules of Criminal Procedure, etc. Further, having observed the defendant during the suppression hearing, the Court concludes that he is not qualified to competently participate in his own defense.

Assuming arguendo that the defendant possesses the skills which are necessary to competently participate in his own defense, the Court would still decline his request to do so in this case. The Supreme Court has repeatedly discouraged trial courts from permitting hybrid representation, stating that it should be used "sparingly," "with caution," and "only in exceptional circumstances." *See Small*, 988 S.W.2d at 673. The Court finds that no such exceptional circumstances are present in this case.

. . . [T]he defendant feels that his attorneys periodically failed to elicit facts which he deems pertinent. An attorney may have many reasons for declining to ask a particular question or elicit certain facts. . . . Allowing the defendant to usurp the professional judgment of his attorneys is extremely dangerous, particularly in a murder trial in which the defendant's life is at stake.

In addition to considering the conflict which will undoubtedly arise between the strategies of the defendant and his attorneys, the Court also notes that the defendant's participation in his defense would likely result in the defendant presenting unsworn testimony which is not subject to cross-examination. Although the Court does not believe that the defendant would intentionally present such testimony, it is inevitable that he will do so. . . .

The trial court, applying *Burkhart*, found that the Appellant was not seeking to disrupt orderly trial procedure but could not competently participate in his own defense. We agree. It is apparent from the record that the Appellant lacked the skills to participate in his own defense. He admitted he was unfamiliar with criminal procedures and gave unsworn testimony at the suppression hearing. "Unsworn statements will not be permitted under any circumstances." *Burkhart* 541 S.W.2d at 371. Furthermore, as noted by the trial court, such an arrangement would have given rise to a conflict between the strategies of the Appellant and his attorneys. Accordingly, we conclude that the trial court did not abuse its discretion by denying the Appellant's motion because the Appellant failed to allege facts constituting any "exceptional circumstances," which justify his participation.

**B. Self-Representation**

Next, the Appellant contends that allowing the Appellant to represent himself at the suppression hearing was error because the trial court did not first determine that the Appellant knowingly and intelligently waived his right to counsel. Specifically, the Appellant argues that a proper waiver was not given because he believed he was operating under a hybrid representation arrangement. The right to represent one's self should be granted only after a determination by the trial court that the defendant is both knowingly and intelligently waiving the valuable right to assistance of counsel. Tenn. R. Crim. P. 44(a); *Johnson v. Zerbst*, 304 U.S. 458, 464-65, 58 S. Ct. 1019, 1023 (1938); *State v. Burkhart*, 541 S.W.2d 365, 368 (Tenn. 1976). First, we note that this issue is waived because neither the Appellant nor his attorneys objected to this arrangement. Tenn. R. App. P. 36(a) (nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error). Regardless of any waiver, the Appellant's argument is incorrect. On April 25, 2000, the Appellant filed a motion for hybrid representation and a motion to suppress his statement. On April 28, 2000, the trial court conducted a hearing on both motions. The trial court took the Appellant's request for hybrid representation under advisement and proceeded with the suppression hearing. Because the trial court had not ruled upon the Appellant's request for hybrid representation, the court permitted the Appellant and his attorneys to question the witnesses at the suppression hearing. Despite the trial court allowing a hybrid representation arrangement for the suppression hearing, only the Appellant conducted cross-examination. However, while the Appellant questioned witnesses, his attorneys were constantly passing him notes and talking with him. Furthermore, the Appellant's attorneys conducted direct examination of the Appellant. We conclude that the Appellant was not deprived of his right to counsel at any time during the suppression hearing. Accordingly, no waiver was necessary and this issue is without merit.

## IV. Motion to Suppress

The Appellant argues that the trial court erred by denying his motion to suppress his statement given to the police after his arrest because "the circumstances surrounding the giving of this statement [were] tainted with coercion and constitutional violations." Specifically, he contends that: (1) he invoked his Fifth Amendment right to counsel soon after his arrest and, therefore, all questioning should have ceased, and (2) his subsequent statement given at the police station was not voluntarily and knowledgeably given.

In reviewing a denial of a motion to suppress, this court looks to the facts adduced at the suppression hearing which are most favorable to the prevailing party. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). In considering the evidence presented at the hearing, this court extends great deference to the fact-finding of the suppression hearing judge with respect to weighing credibility, determining facts, and resolving conflicts in the evidence. *Id.; see also State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). Indeed, these findings will be upheld unless the evidence preponderates otherwise. *Daniel,* 12 S.W.3d at 423.

**A. Miranda**

The Appellant contends that, after his arrest at the Carter Avenue address, he invoked his "Fifth Amendment rights;" thus, all questioning should have ceased. Because questioning did not cease, he contends that the statement thereafter procured by Detectives Roland and Kendall should have been suppressed. Both the United States and Tennessee Constitutions protect a defendant from being compelled to give evidence against himself. U.S. CONST. amend. V; TENN. CONST. art. I, § 9. When a suspect makes an unequivocal request for an attorney, all interrogation must cease, unless the suspect himself initiates further conversation with the police. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 1884-85 (1981); *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994). Repeating the Miranda warning and obtaining a waiver is not compliance. *Edwards*, 451 U.S. at 484, 101 S. Ct. at 1884-85. However, the right to counsel must be claimed. An invocation of the right to counsel "'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355 (1994) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S. Ct. 2204, 2209 (1991)). Whether the Appellant did or did not make an equivocal or unequivocal request for an attorney is a question of fact. *State v. Farmer*, 927 S.W.2d 582, 594 (Tenn. Crim. App.), *perm. to appeal denied*, (Tenn. 1996).

In the present case, the trial court found the Appellant's Fifth Amendment claim to be without merit based upon the following rationale:

> Initially, the Court is of the opinion, based upon the testimony introduced at the hearing, as well as the defendant's videotaped statement, that the defendant was sufficiently advised of his rights as mandated by Miranda v. Arizona, 384 U.S. 436 (1966). The Court is of the opinion that the defendant was orally advised of his rights at the time of his arrest, at the Carter Avenue address, by Det. Kendall. Further, the Court is of the opinion that the defendant was again advised of rights immediately before making the videotaped statement and signed the written rights waiver. The Court does not believe that the defendant invoked his Fifth Amendment privilege against self incrimination, or that the defendant was in any way prevented from invoking any of his constitutionally protected rights. In so finding, the Court accredits the testimony of both Det. Roland and Det. Kendall. The detective's position is supported by the defendant's written waiver of his rights just prior to the interview.

Based upon the evidence presented at the suppression hearing, the trial court, accrediting the testimony of the detectives, found that the Appellant did not invoke his Fifth Amendment privilege against self-incrimination or was in any way prevented from doing so. The evidence does not preponderate against the trial court's findings. The Appellant argues that none of the officers specifically denied "the fact that Mr. Berry invoked his 'Fifth Amendment rights' soon after the police burst into the home." However, both Detectives Roland and Kendall testified that the

Appellant was read his Miranda rights and, thereafter, voluntarily gave a statement, implying that the Appellant did not invoke his privilege against self-incrimination. The trial court is in the best position to determine the credibility of witnesses, and we attribute great weight to the trial court's determinations. *Odom*, 928 S.W.2d at 23. Accordingly, the Appellant is not entitled to relief on this issue.

## B. Voluntary and Knowing Waiver

The Appellant argues that his statement "was not a product of a free, rational and deliberate choice" because "the police officers assaulted him at the time of arrest and demanded that he answer their questions." He contends that the assault is supported "by the fact that he had bruises under his eyes at the time he arrived at the police station." Furthermore, he submits that "at the station Detective Roland told defendant that he could send him away by just signing a piece of paper and that, if he did not talk, Defendant would never see his unborn son."

Inherent in the admissibility of the written statement is that the statement was voluntarily given by a defendant knowledgeable of his constitutional rights and accompanied by a valid and knowing waiver of those rights. *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S. Ct. 1602, 1624, (1966); *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992), *cert. dismissed*, 510 U.S. 124, 114 S. Ct. 651 (1993). In determining the admissibility of a confession, the particular circumstances of each case must be examined as a whole. *State v. Smith,* 933 S.W.2d 450, 455 (Tenn. 1996). A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense. *Id*. (citations omitted). The primary consideration in determining the admissibility of the evidence is whether the confession is an act of free will. *State v. Chandler*, 547 S.W.2d 918, 920 (Tenn. 1977). A confession is not voluntary when "the behavior of the state's law enforcement officials was such as to overbear" the will of an accused and "bring about confessions not freely self-determined." *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S. Ct. 735, 741 (1961)). With regard to the claim that a confession is involuntary, findings of fact made by the trial court after an evidentiary hearing on a motion to suppress are afforded the weight of a jury verdict, and an appellate court will not set aside the trial court's judgment unless the evidence contained in the record preponderates against the findings of the trial court. *Odom*, 928 S.W.2d at 22.

After a suppression hearing, the trial court found that, "based on the facts and circumstances of this particular case, that the defendant executed a knowing, voluntary and intelligent waiver of his constitutional rights prior to answering any questions by Detectives Roland and Kendall about his alleged involvement in the murders and related offenses." The trial court reasoned as follows:

> In so finding, the Court points to the testimony of Det. Kendall and Roland, the defendant's videotaped statement to the detectives, as well as the waiver form executed by the defendant. It is evident to the Court that the defendant understood exactly what he was doing and the repercussions thereof when he agreed to speak with the police. The defendant does not allege that he was intoxicated at the time or

that he was otherwise incapable of making a knowing, voluntary, and intelligent waiver of his rights. Despite the testimony of the defendant, the Court does not believe that the defendant was subjected to such physical and mental abuse so as to overbear his will and render his waiver involuntary. The Court notes that the initial arrest of the defendant, at the Carter Avenue address, may have been done in an aggressive manner with weapons drawn. However, under the facts and circumstances of this particular case and in light of the charges which the detectives were investigating, an aggressive entrance and arrest, which leaves no uncertainty as to the defendant's arrest or the purpose of the arrest, was reasonable under the circumstances.

Finally, as to the actual voluntariness of the defendant's statement, the . . . Court finds that the defendant's statement was the product of the defendant's free, rational, and deliberate choice. . . . The defendant was advised of his rights, waived those rights, executed a written waiver, and subsequently answered questions regarding the incident under no duress from the detectives. In this regard, the Court again accredits the testimony of both Detective Kendall and Roland regarding the circumstances of the interview. The Court finds no indication from the evidence submitted that he was compelled to provide any information to the police. Further, the defendant did not at any time refuse to answer questions or request the interview to cease. In sum, the Court is satisfied that the defendant's statement was voluntarily given and that the tactics employed by the detectives prior to and during the interview were appropriate under the law.

In resolving the conflicting evidence, the trial court explicitly accredited the testimony of Detectives Roland and Kendall and discredited the Appellant's testimony. After making thorough factual findings regarding the credibility issues, the trial court denied the Appellant's motion to suppress. We are bound by the trial court's findings unless the evidence of record preponderates against them. In this case, the evidence supports the findings, and the findings themselves support the court's ruling. The Appellant signed a written waiver of rights form and gave a videotaped statement, during which he did not appear under duress. Furthermore, the bruises under the Appellant's eyes at the time he arrived at the police station do not support the conclusion that the Appellant was subject to mental and physical abuse by the detectives, as these bruises could have been inflicted at any time prior to the Appellant's arrest. This evidence was available to the trial court, and the court chose to discredit the Appellant's testimony that the bruises resulted from physical abuse by the detectives. As such, we must conclude that the trial court properly ruled that the Appellant's statement was admissible.

## V. Voir dire

The Appellant contends that "the trial court abused its discretion in the jury selection process by improperly rehabilitating jurors who were properly excludable for cause, and improperly excluding other jurors who were or could be rehabilitated in regard to their reservations concerning

-8-

the death penalty." Tennessee Rule of Criminal Procedure 24(b) gives the trial judge the right to excuse a juror for cause without examination of counsel. *State v. Hutchison*, 898 S.W.2d 161, 167 (Tenn. 1994), *cert. denied*, 516 U.S. 846, 116 S. Ct. 137 (1995) (citing *State v. Alley*, 776 S.W.2d 506 (Tenn. 1989), *cert. denied*, 493 U.S. 1036, 110 S. Ct. 758 (1990)); *State v. Strouth*, 620 S.W.2d 467, 471 (Tenn. 1981), *cert. denied*, 455 U.S. 983, 102 S. Ct. 1491 (1982)). In determining when a prospective juror may be excused for cause because of his or her views on the death penalty, the standard is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 852 (1985) (footnote omitted). The Supreme Court further observed that "this standard likewise does not require that a juror's biases be proved with 'unmistakable clarity.'" *Id*. However, the trial judge must have the "definite impression" that a prospective juror could not follow the law. *Hutchinson,* 898 S.W.2d at 167 (citing *Wainwright v. Witt*, 469 U.S. at 425-26, 105 S. Ct. at 853). Finally, the trial court's finding of bias of a juror because of his or her views concerning the death penalty are accorded a presumption of correctness, and the Appellant must establish by convincing evidence that the trial court's determination was erroneous before an appellate court will overturn that decision. *Alley*, 776 S.W.2d at 518.

The Appellant challenges the following questions and responses of the prospective jurors:

1. Prospective Juror 102 - The Appellant argues that the trial court erred by "[b]rowbeating a juror who said that she could not consider a life sentence for murder into saying that, in certain circumstances, she could consider a life with parole sentence." The record contains no evidence of "browbeating." Rather, the record reveals that the trial court asked reasonable questions to clarify inconsistent responses regarding sentencing options.

2. Prospective Juror 103 - The Appellant argues that the trial court erred by disregarding sworn answers on the jury questionnaire "which would lead to exclusion by explaining that the rehabilitation questions were 'just trying to get down to what they really think.'" On the questionnaire, Juror 103 disclosed that she could not consider a life sentence as a sentencing option. However, the trial court accepted the juror's informed clarification of that answer after she stated that she could follow the law and consider a life sentence as an option.

3. Prospective Jurors 106, 113, and 116 - The Appellant argues that the trial court erred in "[s]ummarily excusing jurors who answered negatively in regard to their ability to impose the death penalty without any discussion or attempt to 'get down to what they really think' which is what the judge did in regard to pro-death penalty jurors." After questioning, each of these jurors unequivocally stated that he/she could not impose the death penalty.

4. Prospective Jurors 110, 125, and 127 - The Appellant contends that the trial court went to great lengths to rehabilitate these jurors. First, Jurors 110 and 125 were not

challenged for cause and, therefore, this issue is waived. Nonetheless, Jurors 110 and 125 stated that they could follow the law and consider imposing a life sentence, despite personal reservations. Concerning Juror 127, he was summarily excused because he stated he could not impose the death penalty under any circumstances.

5. Prospective Juror 118 - The Appellant contends that the trial court improperly rehabilitated Juror 118, "who stated at least twice that it would have to be 'extraordinary' to depart from the death penalty and that she started with the death penalty not a life sentence." This juror did not say she would start with the death penalty and only depart from a death sentence upon a showing of extraordinary mitigating circumstances. Juror 118 did state that she would impose the death penalty unless the mitigating circumstances were "extraordinary." Thereafter, upon questioning by the court, she stated that she could follow the law, *i.e.*, aggravating circumstances have to outweigh mitigating circumstances before imposition of the death penalty.

6. Prospective Juror 123 - The Appellant submits that the trial court "incorrectly advised him that the State would simply have to present 'more aggravating circumstances than there are mitigating circumstances.'" The Appellant also contends that it was error to accept Juror 123 because, on the questionnaire, this juror answered that the death penalty was appropriate in all murder cases. In response to this answer, the trial court stated, "it concerned me, because I didn't think that answer was what we were looking for, for people to be on the Jury. But I think that, maybe, he didn't get that question exactly clear. And he did qualify that[.] . . ." First, the trial court did not improperly advise the juror on the procedure for imposing the death penalty; rather, the trial court advised that a death sentence could only be imposed after a determination that the aggravating factors outweighed the mitigating factors. Second, the trial court sought clarification of the juror's answer on the questionnaire. The trial court was satisfied that this juror adequately explained his answer.

7. Prospective Jurors 129, 132, and 142 - The Appellant contends that the trial court improperly rehabilitated "jurors who rejected life with parole punishment and voiced opinions that minimum penalty for murder must be life without parole by asking leading questions[.] . . ." First, this issue is waived because these jurors were not challenged for cause. Regardless of waiver, each of these jurors stated that they would follow the law and consider all three sentencing options, including a life sentence.

8. Prospective Juror 143 - The Appellant argues that it was error to accept this juror because he stated that "he would reject environment as a mitigating factor." While he did express some reservations about environment being a mitigating factor, the

-10-

trial court accepted him because he said he would consider the mitigating factors offered and did not dismiss environment as a mitigating circumstance completely.

9. Prospective Juror 156 - The Appellant contends that it was error to ask Juror 156 "'I mean you wouldn't consider it all?' when defense gets answer that juror said he would 'never' consider environment and thus promoting the juror to the 'right' answer." Because there was no challenge for cause, this issue is waived. Regardless, when questioned by the Appellant, Juror 156 stated he could not consider environment as a mitigating circumstance. Then, the trial court explained the sentencing procedure to the juror, and the juror stated he could follow the law and consider environment in mitigation.

10. Prospective Juror 188 - The Appellant assigns as error "[t]elling defense counsel 'hold on a minute' as counsel solicited juror opinion that there was 'no way' juror could impose life sentence or life without parole for cold-blooded murder, and then lecturing juror enough so that juror yielded and gave the acceptable response." This issue is waived because the Appellant did not challenge this juror for cause. In any event, the trial court did not lecture but, rather, intervened to clarify a point of confusion. Thereafter, the juror stated he understood and could follow the law.

11. Prospective Juror 190 - The Appellant claims that the trial court erred in rehabilitating this juror by "[i[ntervening with the purpose of curing a juror's admission that 'there's no way in the world' he could consider environment as a mitigating factor with the platitude 'I'm not trying to talk you into . . .[.]'" Again, this issue is waived because the juror was not challenged for cause. After stating that he would not consider environment as a mitigating factor, the trial court asked Juror 190 to clarify his response. The juror then stated that he would consider it and give it the weight it deserves.

12. Prospective Juror 193 - The Appellant submits that the trial court erred by "[t]alking a juror into saying that she would follow the law when the juror indicated that the only mitigating factor she could consider would be mental problems and abuse. After finally getting the right response, the judge says 'that's all I need to know.'" The trial court intervened and explained death penalty sentencing procedure after Juror 193 gave some inconsistent answers regarding mitigating factors. The juror then stated she could follow the law.

After reviewing the answers and responses of the challenged jurors, we conclude that the respective jurors were either properly rehabilitated or their answers left "no leeway for rehabilitation." *Strouth*, 620 S.W.2d at 471; *see also Alley*, 776 S.W.2d at 517-18. In each instance, the prospective juror was extensively questioned as to whether they could apply the law to the evidence and consider all forms of punishment in this case. As noted by the trial court, the court "distributed a jury questionnaire,

allowed the parties to question each juror individually, provided the [Appellant] with a jury consultant, and made every effort to select a fair and impartial jury." There is no error.

## VI. Gang Evidence

The Appellant argues that admission of evidence regarding his "association and membership in the Gangster Disciples" violated Tennessee Rule of Evidence 404(b) and constituted reversible error. Admissible proof must satisfy the threshold determination of relevancy mandated by Tennessee Rule of Evidence 401, which defines relevant evidence as that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Rule 403 adds that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Finally, Rule 404 deals with "character evidence." Subsection (b) of this rule provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). However, the same subsection further sets out that such evidence may be allowed "for other purposes" if the following conditions are met prior to admission of this type of proof:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

*Id.* Providing further clarification concerning the second requirement, "other purposes" have been defined to include: (1) motive; (2) intent; (3) guilty knowledge; (4) identity of the defendant; (5) absence of mistake or accident; (6) a common scheme or plan; (7) completion of the story; (8) opportunity; and (9) preparation. *State v. Robert Wayne Herron*, No. M2002-00951-CCA-R3-CD (Tenn. Crim. App. at Nashville, Jan. 22, 2003) (citing *Collard v. State*, 526 S.W.2d 112, 114 (Tenn. 1975); NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 404.6 (3d ed. 1995)); *see also* Advisory Commission Comments, Tenn. R. Evid. 404; *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985); *Bunch v. State*, 605 S.W.2d 227, 229 (Tenn. 1980); *State v. Jones*, 15 S.W.3d 880, 894 (Tenn. Crim. App. 1999), *perm. to appeal denied*, (Tenn. 2000). Should a review of the record indicate that the trial court substantially complied with the requirements of Rule 404(b), the trial court's admission of the challenged evidence will remain undisturbed absent an abuse of discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997) (citation omitted).

In the order denying the Appellant's motion for new trial, the trial court made the following findings concerning the admission of gang-related testimony:

> Typically, the Court would evaluate such an allegation by weighing the probative value of the testimony against the possible prejudice to the defendant. However, such an evaluation is not necessary in this case. Instead, the Court concludes that defense counsel made a tactical decision to allow this testimony, which supported their theory of the case. Counsel may not now seek relief merely because that strategy was unsuccessful. . . .

> [T]he Court anticipated that one of the parties might wish to delve into gang-related issues during the course of this trial.

> The Court first noticed a reference to the gang during the hearing on the defendant's motion to suppress his statement to the police. Although the defendant's statement contained multiple gang-related references, defense counsel did not object to the statement on that basis. Instead, they chose to attack the admissibility of the statement on other grounds. When the Court rejected those arguments, defense counsel did not request that the statement be redacted. . . .

> The first witness to mention the gang in the jury's presence was Antonio Cartwright. Prior to this testimony, the Court requested a bench conference. During its discussions with counsel for the State and the defendant, the Court suggested that it might be inappropriate to make any references to the gang. In response, the State noted that the defendant made numerous gang references in his statement to the police and that defense counsel had not sought redaction of those references. The State also stated that it merely intended to question Cartwright regarding essentially the same information the defendant provided during his statement.

> During this discussion, defense counsel made no effort to echo the Court's concerns, object to the proposed testimony, or request that the defendant's statement be redacted. Because defense counsel raised no objection to the proposed testimony, which did not appear to be inconsistent with his theory of the case, the Court granted the State's request to present a limited amount of testimony concerning the gang. . . .

> Defense counsel failed to object to the testimony regarding gangs. Indeed, counsel elicited much of it themselves and used it to support their theory of the case. Through this testimony as well as the defendant's statement to the police, counsel sought to establish that Davis perpetrated the offense, that the defendant was present at the scene of the crime but did not participate in the offenses, that due at least in part to the presence of Davis and possibly other gang members the defendant was

-13-

afraid to leave the scene, and that the evidence would have exonerated the defendant if the police had properly collected and tested it.

Given these circumstances, the Court finds that counsel made a tactical decision to allow this testimony. As such, the defendant is not entitled to relief.

We agree with the trial court that the Appellant has waived consideration of this issue. At no point did trial counsel object to these comments. The trial court, upon its on accord, requested a bench conference to discuss the admissibility of gang-related testimony. During this discussion, trial counsel made no attempts to object to this type of evidence. Furthermore, as noted by the trial court, trial counsel elicited much of the testimony themselves in order to support a defense theory of facilitation, *.i.e.*, co-defendant Davis was the leader of the gang and, therefore, the Appellant was afraid to leave the scene. Because no objection was entered, the trial court did not conduct a Rule 404(b) hearing and, without any such findings, we are unable to preform any meaningful appellate review of the issue. Additionally, the trial court gave a limiting instruction regarding the purposes for which the jury could consider the gang-related testimony. An appellate court must presume that the jury followed the instruction given by the trial court. *State v. Gilleland*, 22 S.W.3d 266, 273 (Tenn. 2000) (citation omitted). Based on the foregoing, we find that the Appellant has waived this issue. Tenn. R. App. P. 36(a) (nothing in this shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error).

## VII. Hearsay Statement

In his next assignment of error, the Appellant contends that the trial court erred in allowing Antonio Cartwright to testify about a conversation between the Appellant and co-defendant Davis, "where the [two men] were alleged to have planned a robbery of the victims." Specifically, he argues that this evidence constituted inadmissible hearsay. The testimony at issue is as follows:

Q. Did you hear any discussion between Mr. Berry and Mr. Davis and yourself?

A. Yes, ma'am.

Q. What was that discussion about?

A. About a robbery.

Q. And what was said to you about the robbery?

MR. GIBSON: Object to hearsay.

THE COURT: Well, we need to identify who this is that he's talking about?

-14-

Q. (By General Miller) Who was having this discussion, first of all?

A. Christopher Davis, Gdongalay Berry.

Q. And were they having a discussion in your presence or were they actually talking to you about it.

A. In my presence.

Q. Okay. And were they asking you questions or did you participate in a conversation at some point?

A. I didn't really participate in the conversation at that time; no ma'am.

THE COURT: You were present when this conversation was going on between Mr. Berry and Mr. Davis; is that what you're saying?

THE WITNESS: Yes, sir.

THE COURT: All right. I'm going to overrule the objection. He was present and the defendant was present. It was a conversation in this presence. He can testify about it.

MR. GIBSON: Your Honor, shouldn't he only be able to testify to what my client said, not Christopher Davis?

THE COURT: I think he can testify about the whole conversation between people that were allegedly co-conspirators in a – in an alleged robbery that was being planned.

So go ahead, please.

Q. (By General Miller) What was the conversation about, Mr. Cartwright?

A. It was about a robbery.

Q. Okay. And did you know who the robbery was supposed to happen to?

A. Yes, ma'am; I did.

Q. And who was that?

A. Greg Ewing and DeAngelo Lee.

-15-

Q. Okay. And what was said about the robbery?

A. Uh –

Q. What was it to be a robbery of?

A. The guns and a car.

Q. Guns and a car?

A. Yes, ma'am.

Q. Okay. And how was this robbery supposed to take place?

A. They were supposed to go get some guns, and when Chris give the signal and cocked the gun, G-Berry is supposed to have come out.

Q. All right. And did Mr. G – Mr. Gdongalay Berry make any specific remarks about the robbery?

A. Yes. If we rob 'em, we gotta kill 'em.

Q. Did he say why?

A. Because they know us.

Q. Because they know us?

A. Yes, ma'am.

Q. And that's what Mr. Berry said?

A. Yes, ma'am.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is not admissible except as provided by the rules of evidence or otherwise by law. Tenn. R. Evid. 802. Pursuant to Rule 803(1.2)(E), Tennessee Rules Evidence, a statement that is hearsay is allowed against a party when made "by a co-conspirator of a party during the course of and in furtherance of the conspiracy." A conspiracy is defined as a combination between two or more persons to do a criminal or unlawful act or a lawful act by criminal or unlawful means. *State v. Lequire*, 634 S.W.2d 608, 612 (Tenn. Crim. App. 1981), *perm. to appeal denied*, (Tenn. 1982) (citation omitted). Declarations of a co-conspirator that would otherwise be inadmissible may be

-16-

offered as proof, when the following conditions are met: (1) there is evidence of the existence of the conspiracy and the connection of the declarant and the defendant to it; (2) the declaration was made during the pendency of the conspiracy; and (3) the declaration was made in furtherance of the conspiracy. *State v. Gaylor*, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992), *perm. to appeal denied*, (Tenn. 1993) (citations omitted). A "statement may be in furtherance of the conspiracy in countless ways. Examples include statements designed to get the scheme started, develop plans, arrange for things to be done to accomplish the goal, update other conspirators on the progress, deal with arising problems, and provide information relevant to the project." *State v. Carruthers*, 35 S.W.3d 516, 556 (Tenn. 2000) (citation omitted). If a conspiracy is shown to exist, the co-conspirator's statement is admissible even though no conspiracy has been formally charged. *Lequire*, 634 S.W.2d at 612 n.1.

For admissibility purposes, the standard of proof required to show the existence of the prerequisite conspiracy is proof by a preponderance of the evidence. *State v. Stamper*, 863 S.W.2d 404, 406 (Tenn. 1993). The State only has to show an implied understanding between the parties, not formal words or a written agreement, in order to prove a conspiracy. *Gaylor*, 862 S.W.2d at 553. "The unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprises." *Id.* (citation omitted).

The trial court in the present case determined that a conspiracy existed between the Appellant and co-defendant Davis and that the statements were in furtherance of that conspiracy.[1] The trial court based its finding upon the fact that the Appellant "and Davis discussed the robbery and murders they intended to commit, and executed their plan shortly thereafter." We believe that this constitutes adequate proof for the trial court to find by a preponderance of the evidence that a conspiracy existed between the Appellant and Davis. Thus, the evidence was admissible under Rule 803(1.2)(E).

## VIII. Closing Argument

The Appellant contends that "the State made an inappropriate religious argument during its closing argument." During closing argument, the prosecutor made the following comment:

> Well, we talked a little bit in voir dire about crimes. You know, yeah, it would be nice if this crime had occurred in the parking lot of the Baptist Church down – downtown, about 10 o'clock, when it was full of good, solid citizens who could come into court and wouldn't have to explain the sentence that they were currently serving or a sentence that was pending against them. We don't have that in this case, because none of the parties involved are people that attended church on Sunday during this part of their life, but that doesn't mean that their lives are not

---

[1] The trial court also found that the testimony was admissible as an "adoptive admission" pursuant to Tennessee Rule of Evidence 803(1.2)(B). However, we conclude that the testimony clearly falls within the co-conspirator exception to the hearsay rule and, therefore, find it unnecessary to address whether the testimony is also admissible as an "adoptive admission."

precious. That doesn't mean that Mr. Berry's life is not precious. But he should be held accountable for this crime.

Closing arguments are an important tool for both parties during the trial process; consequently, attorneys are usually given wide latitude in the scope of their arguments. *State v. Bigbee*, 885 S.W.2d 797, 809 (Tenn. 1994) (citation omitted). Trial courts are accorded wide discretion in their control of those arguments. *State v. Zirkle*, 910 S.W.2d 874, 888 (Tenn. Crim. App.), *perm. to appeal denied*, (Tenn. 1995) (citation omitted). Moreover, a trial court's finding will not be reversed absent an abuse of that discretion. *State v. Payton*, 782 S.W.2d 490, 496 (Tenn. Crim. App.), *perm. to appeal denied*, (Tenn. 1989) (citation omitted). Such scope and discretion, however, is not completely unfettered. It is settled law in this state that references to biblical passages or religious law during a criminal trial are inappropriate. *State v. Middlebrooks*, 995 S.W.2d 550, 559 (Tenn. 1999) (citation omitted); *State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994); *Kirkendoll v. State*, 281 S.W.2d 243, 254 (Tenn. 1955). Such references, however, do not constitute reversible error unless the Appellant can clearly establish that they "'affected the verdict to the prejudice of the defendant." *Middlebrooks*, 995 S.W.2d 559 (quoting *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965)). In making this determination, we must consider: 1) the conduct complained of, viewed in light of the facts and circumstances of the case; 2) the curative measures undertaken by the court and the prosecution; 3) the intent of the prosecutor in making the improper arguments; 4) the cumulative effect of the improper conduct and any other errors in the record; and 5) the relative strength and weakness of the case. *Id*. at 560 (citing *Bigbee*, 885 S.W.2d at 809).

We note that the Appellant did not contemporaneously object to the prosecutor's statements during closing argument. Therefore, the issue has been waived. Tenn. R. App. P. 36(a). It has been firmly established that objections must be made to an improper jury argument in order to preserve the issue for appellate review; otherwise, any improper remarks by the State would afford no ground for a new trial. *State v. Compton*, 642 S.W.2d 745, 747 (Tenn. Crim. App.), *perm. to appeal denied*, (Tenn. 1982).

Regardless of any waiver, we find that this issue has no merit. In its order denying the Appellant's motion for new trial, the trial court found no error during closing argument based upon the following rationale:

> The Court recognizes that it is improper for attorneys to make religious references during their closing arguments. . . . However, the Court disagrees that the State did so in this case. Several of the State's witnesses had prior convictions and/or were facing criminal charges at the time they testified. Moreover, the victims were selling guns at the time of their deaths, and there was evidence that one of them had taken drugs at some point prior to being killed. During its closing argument, the State simply acknowledged that its victims and witnesses may have been less-than-perfect, but argued that these facts did not render the defendant any less culpable. The Court finds this argument was proper.

We agree with the trial court that the prosecutor's comments were not inappropriate references to biblical passages or religious law. As noted by the trial court, the comment was made in order to recognize the type of people involved in the case and to emphasize that the Appellant should still be held accountable for his illegal actions, not to interject a biblical passage or religious law into closing argument. Furthermore, the Appellant has failed to show any prejudice resulting from the comments. The case against the Appellant was relatively strong, as he admitted he was present at the construction site when the victims were murdered.

## IX. Flight Instruction

The Appellant next contends that the trial court's use of a Tennessee Pattern Jury Instruction on flight was unwarranted by the evidence. Before review of the issue as presented, we note that, when the State requested this instruction, the Appellant did not object and, therefore, this is waived. Tenn. R. App. 36(a). Nonetheless, given our heightened standard of review generally applicable to convictions resulting in a sentence of death, we proceed to examine the issue on the merits.

Following the presentation of the evidence, the trial court gave the jury the following instruction regarding flight:

> The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination.

> The law makes no precise distinction as to the manner or method of flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

> If the flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

> Whether there was flight by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

7 TENNESSEE PRACTICE, TENNESSEE PATTERN JURY INSTRUCTIONS - CRIMINAL 42.18 (Comm. of the Tenn. Judicial Conference 5th ed. 2000). This pattern jury instruction is a correct statement of the applicable law and has been previously cited with approval by our court. *See, e.g., State v. Kendricks*, 947 S.W.2d 875, 885-86 (Tenn. Crim. App. 1996), *perm. to appeal denied*, (Tenn. 1997); *State v. Terry Dean Sneed*, No. 03C01-9702-CR-00076 (Tenn. Crim. App. at Knoxville, Nov. 5, 1998), *perm. to appeal denied*, (Tenn. 1999). In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction. Sufficient evidence supporting such instruction requires "'both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community.'" *State v. Burns*, 979 S.W.2d 276, 289-90 (Tenn. 1998) (quoting *Payton*, 782 S.W.2d at 498).

Here, the Appellant both ran from the apartment, while being chased by police officers, and alluded the police for approximately one week before being apprehended. This evidence clearly supported the trial court's instruction on flight. The Appellant contends, however, that the trial court erred in giving the flight instruction because the instruction

> may only be given when the defendant attempts to withdraw himself for the purpose of evading arrest for the specific crime that has been charged. Because it is impossible to determine from these facts whether the Defendant fled to evade arrest for the charged crimes or for some other reasons, the court erred in giving the flight instruction.

We do not find the Appellant's argument persuasive. The trial court found that giving a flight instruction was not error based upon the following rationale:

> Following the murders, the defendant fled the scene of the crime, slept in a hotel as opposed to his home or the Herman Street residence, ran from the police officers the next morning, and remained at large for approximately one week. Given these circumstances, the Court finds that an instruction on flight was appropriate.

> The defendant contends that the instruction was inappropriate because he may have been fleeing as a result of his involvement in the murder of Adrian Dickerson as opposed to the double homicide at issue in this case. Although the officers from whom the defendant fled were unaware of his involvement in the double homicide, the defendant was not privy to that information. The defendant fled immediately upon encountering the officers, and it is reasonable to assume that he did so in an attempt to evade arrest for any and all crimes he had previously committed.

> The record does not support a theory that the defendant fled solely in an effort to evade arrest for the murder of Adrian Dickerson. Indeed, given the fact that the double homicide occurred mere hours before the defendant's encounter with the officers, the defendant likely assumed the officers were investigating that incident. In any event, the defendant has not provided the Court with any authority which

prohibits a flight instruction when a defendant has multiple motives for fleeing. The Court finds this issue to be without merit.

Based upon the facts of the case, we conclude, as did the trial court, that the jury could infer that the Appellant fled due to his involvement in any and all crimes he had previously committed. A flight instruction is not prohibited when there are multiple motives for flight because to determine otherwise would prevent a flight instruction when a defendant evades arrest for numerous crimes. A defendant's specific intent for fleeing a scene is a jury question. Accordingly, the trial court properly instructed the jury on flight.

## [Deleted: X. Sufficiency of the Evidence]

## XI. Victim Impact Testimony

The Appellant's challenge to the introduction of victim impact evidence is limited to the testimony of Brenda Ewing Sanders, mother of the victim Ewing. The victim impact testimony complained of is as follows:

Q. Until you were sitting in the courtroom the other day and heard the testimony of Dr. Levy, did you have any idea of how many times your son had been shot?

A. No, I had no idea that my son was shot seven times.

Q. The police didn't tell you that?

A. No.

Q. And until you heard Mr. Berry's statement played for you, did you realize that your son was screaming for his life before he was killed?

A. I didn't, but that was something that I've always wanted to find closure of, of what he was saying when this was happening to him, if he was even asking, just tell my mother something.

The trial court concluded that "Sanders' testimony did not exceed the scope of appropriate victim impact testimony." The Appellant contends that this testimony does not address any "unique characteristics" about the victim; rather, it offers "characterizations and opinions about the crime." We note that this issue is waived because neither the Appellant nor his attorneys objected to Sanders' testimony during the jury-out hearing or her testimony. Tenn. R. App. P. 36(a). Nonetheless, we proceed to address the merits of the Appellant's argument.

In *State v. Nesbit*, 978 S.W.2d 872, 889 (Tenn. 1998), our supreme court held that victim impact evidence and prosecutorial argument is not barred by the federal and state constitutions. *See*

*also Payne v. Tennessee*, 501 U.S. 808, 827, 111 S. Ct. 2597, 2609 (1991) (holding that the Eighth Amendment erects no *per se* bar against the admission of victim impact evidence and prosecutorial argument); *State v. Shepherd*, 902 S.W.2d 895, 907 (Tenn. 1995) (holding that victim impact evidence and prosecutorial argument are not precluded by the Tennessee Constitution). Notwithstanding the holding that victim impact evidence is admissible under Tennessee's death penalty sentencing scheme, the introduction of such evidence is not unrestricted. *Nesbit*, 978 S.W.2d at 891. Victim impact evidence may not be introduced if (1) it is so unduly prejudicial that it renders the trial fundamentally unfair, or (2) its probative value is substantially outweighed by its prejudicial impact. *Id.* (citations omitted); *see also State v. Morris*, 24 S.W.3d 788, 813 (Tenn. 2000) (Appendix), *cert. denied*, 531 U.S. 1082, 121 S. Ct. 786 (2001).

"Victim impact evidence should be limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family." *Nesbit,* 978 S.W.2d at 891( footnote and citations omitted). Admission of a victim's family members' characterizations and opinions about the crime, the Appellant, and the appropriate sentence is improper. *Id.* at 888 n.8. The victim impact evidence complained of by the Appellant is clearly of the nature envisioned by *Nesbit. See generally State v. Smith*, 993 S.W.2d 6, 17 (Tenn. 1999). The fact that the death of a loved one is devastating requires no proof. *Morris*, 24 S.W.3d at 813 (Appendix). Accordingly, we cannot conclude that the admission of the victim impact testimony was unduly prejudicial. This issue is without merit.

**[Deleted: XII.  Proportionality Review]**

_____
DAVID G. HAYES, JUDGE